IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| CAROLYN BARNES,<br><br>*Plaintiff,*<br><br>v.<br><br>USAA FEDERAL SAVINGS BANK,<br><br>*Defendant.* | Civil Action No. 3:23CV00051 |

**COMPLAINT**

Plaintiff Carolyn Barnes, by counsel, files this Complaint against Defendant USAA Federal Savings Bank ("USAA" or "Defendant"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. In 1992, Ms. Barnes purchased a home with her then-husband, Michael T. Barnes.

2. In 2005, Ms. Barnes and Mr. Barnes obtained a Home Equity Line of Credit ("HELOC") on their home from USAA. The HELOC's credit limit was $75,000.00.

3. Under the HELOC agreement, USAA could not amend the credit limit or other material terms without Ms. Barnes's written consent.

4. Ms. Barnes and Mr. Barnes legally separated on September 15, 2020, with Ms. Barnes obtaining full ownership of the marital home shortly before the legal separation.

5. Before their separation, Ms. Barnes and Mr. Barnes borrowed against the HELOC and made timely payments on the amounts borrowed under the HELOC Agreement. At the time of their separation, the HELOC had a zero balance.

6. Following their separation and unbeknownst to Mrs. Barnes, in 2022, Mr. Barnes changed the mailing address on the HELOC and made several draws such that the total balance of

the HELOC today exceeds $350,000.00—over four times the original credit limit. Even worse, Mr. Barnes has failed to make timely payments on the HELOC balance, putting the account into delinquency.

7. USAA did not obtain Ms. Barnes's consent to increase the credit limit beyond $75,000.00 or to allow draws above that limit. Nor did it inform Ms. Barnes that Mr. Barnes had drawn on the HELOC beyond the credit limit.

8. As a result, Ms. Barnes was completely unaware of Mr. Barnes's draws until the fall of 2022. Indeed, without Ms. Barnes's knowledge or consent, and with USAA's permission, Mr. Barnes had changed the address of record for the HELOC statements to his own address, leaving Ms. Barnes completely unaware of the charges that Mr. Barnes made to the HELOC. Ms. Barnes did not receive a single statement from USAA until December 2022, when her attorney subpoenaed the statements as part of the divorce proceedings.

9. Ms. Barnes at no point provided her consent, authorization, or permission for USAA to increase the credit limit on the HELOC above $75,000.00, or to allow draws above that amount.

10. Despite USAA's breach of its obligations under the HELOC, USAA continued to report the HELOC balance well above the agreed-to credit limit, as well as Mr. Barnes's past due amounts, on Ms. Barnes's Equifax, Experian, and Trans Union credit reports.

11. When Ms. Barnes notified USAA, both directly and through dispute letters to the credit bureaus, that she disputed the reporting of the HELOC on her credit reports and the reasons for that dispute, USAA failed to conduct an adequate investigation and simply reiterated that Ms. Barnes was jointly and severally liable for the HELOC balance.

12. USAA's breach of the HELOC agreement and refusal to correct its inaccurate reporting about the HELOC in response to Ms. Barnes's disputes have significantly damaged Ms. Barnes. For example, because of the delinquent status of the HELOC, her home is at risk of foreclosure. Ms. Barnes's credit score has plummeted, and Ms. Barnes has suffered significant emotional distress because of USAA's conduct.

13. USAA has therefore left Ms. Barnes with no choice but to bring this Complaint alleging that USAA violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b)(1) by failing to (a) remove the HELOC account balance and the derogatory payment history from Ms. Barnes's credit reports and (b) fully and properly investigate her disputes.

14. Ms. Barnes also alleges that USAA breached the terms of the HELOC Agreement by failing to obtain her consent to increase the credit limit above $75,000.00, and to allow draws above that amount, and for failing to provide her monthly statements on the account. Alternatively, USAA has breached the covenant of good faith and fair dealing that it owed to Ms. Barnes under the HELOC agreement.

## JURISDICTION AND VENUE

15. This Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 168l(p). It also has supplemental jurisdiction over Ms. Barnes's state-law claims under 28 U.S.C. § 1367.

16. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Barnes's claims occurred in this District, where Ms. Barnes resides.

## PARTIES

17. Plaintiff Carolyn Barnes is a natural person who resides in Charlottesville, Virginia. She is a "consumer" as defined by 15 U.S.C. § 1681a(c).

3

18.     Defendant USAA Federal Savings Bank is a federal bank with its principal place of business at 10750 McDermott Freeway, San Antonio, Texas 78288-0544.  USAA is a "furnisher" as governed by the FCRA.

## FACTS

**A.     The USAA HELOC**

19.     Ms. Barnes is a longtime resident of Central Virginia.

20.     In September 1976, she married Michael T. Barnes in Charlottesville, Virginia, to whom she would remain married for nearly forty-seven (47) years, raising several children.

21.     In 1992, Ms. Barnes and her then-husband, Mr. Barnes, purchased a home in Charlottesville, Virginia (the "Residence").

22.     On July 13, 2005, the Barneses executed a "Home Equity Line of Credit Agreement" with USAA (the "HELOC Agreement"). (Attached as **Exhibit A**.)

23.     Under the HELOC Agreement, USAA agreed to provide up to $75,000.00 in total credit to Ms. Barnes and Mr. Barnes as co-borrowers.  Ex. A.

24.     The HELOC Agreement further provided that "[g]enerally, the terms of this Agreement cannot be changed."  Ex. A ¶ 24.  Specifically, USAA could change the terms of the Agreement, including the credit limit, only if Ms. Barnes and Mr. Barnes agreed in writing to the change, or the change: (a) would "unequivocally benefit [Ms. Barnes and Mr. Barnes]; (b) was "insignificant"; (c) constituted a change to the index and margin that maintained substantially the same annual percentage rate in effect at the time the original index became unavailable; or (d) was permitted elsewhere in the Agreement.  *Id.*

25.     The HELOC Agreement did not permit USAA to unilaterally change the credit limit, except to *decrease* the limit under certain circumstances.  Ex. A ¶ 21.

26. To the contrary, the Agreement stated explicitly that USAA would "not ordinarily grant a request for an advance [on the HELOC] that would cause the unpaid principal of [the] Loan Account Balance to be greater than the Credit Limit . . . ." Ex. A ¶ 6.

27. Additionally, the HELOC Agreement required USAA to provide periodic statements if there was an outstanding balance on the account or if the account has "any account activity." Ex. A ¶ 28.

28. Because USAA failed to provide Ms. Barnes with the monthly statements, it prevented her from stopping the unauthorized use of the HELOC.

### B. Ms. Barnes's Separation and Divorce from Mr. Barnes and Subsequent Draws on the HELOC

29. In 2020, Ms. Barnes learned that her then husband had inappropriate online relationships. Subsequently, on September 15, 2020, Ms. Barnes and Mr. Barnes legally separated. In anticipation of their separation, on September 9, 2020, Mr. Barnes transferred his interest in the Residence to Ms. Barnes via a Deed of Gift.

30. At the time of their legal separation and the transfer of the Residence to Ms. Barnes, the HELOC had a zero balance.

31. Following the separation, Mr. Barnes, who apparently was the victim of an online "romance scam" attempted to use the HELOC to send monies to his various scammers.

32. To do so, Mr. Barnes changed the address of record for statements and other correspondence regarding the HELOC to his personal address, at which Ms. Barnes does not reside. USAA allowed the HELOC statements to be sent to an address other than the Residence even though Mr. Barnes's residence was not the property against which the HELOC was secured. Because of this, USAA did not mail statements or other correspondence regarding the HELOC to

Ms. Barnes, despite her continuing to reside in the Residence, nor was she notified of the change of address for the monthly statements.

33. Then, without Ms. Barnes's knowledge or consent, between June and October 2022, Mr. Barnes requested additional draws on the HELOC far exceeding the total credit limit of $75,000.00. Because of these additional advances to Mr. Barnes, as of January 1, 2023, the HELOC balance totaled approximately $348,000.00. Today, the total account balance reported on the HELOC exceeds $350,000.00.

34. USAA allowed Mr. Barnes to draw on the HELOC in amounts well above the $75,000.00 credit limit without notifying Ms. Barnes or obtaining her consent to the material changes in the terms of the HELOC.

35. Ms. Barnes did not consent and would not have consented to the more-than-four-fold increase in the credit limit of the HELOC from $75,000.00 to over $350,000.00, nor did she consent to draws on the HELOC beyond the $75,000.00 limit.

36. Even though the HELOC Agreement prohibited USAA from making material changes to the terms of the HELOC without Ms. Barnes's written consent, USAA allowed Mr. Barnes to increase the credit limit of the account and to make draws on the account far above the credit limit that Ms. Barnes had agreed to.

37. In both 2022 and 2023, again without Ms. Barnes's knowledge or consent, Mr. Barnes has failed to make timely payments on the HELOC account, resulting in the account being reported as past due on Ms. Barnes's Equifax, Trans Union, and Experian credit reports. The account is now also at risk of foreclosure due to the past due amounts.

38.     USAA also reported the total account balance on the HELOC as the approximately $350,000.00 outstanding balance, which balance was also (and still is) reflected on Ms. Barnes's credit reports.

39.     Ms. Barnes was unaware of the increased account balance for the HELOC until approximately September 2022.  At no point did USAA mail her any statements so she could identify and prevent Mr. Barnes's draws on the HELOC.

40.     On February 27, 2023, as part of their divorce proceedings, Ms. Barnes and Mr. Barnes executed a Separation and Property Settlement Agreement ("Property Settlement").  As part of the Property Settlement, Mr. Barnes acknowledged his unauthorized draws on the HELOC.

**C.     USAA's Refusal to Reasonably Investigate the Dispute HELOC**

41.     After USAA continued to inaccurately report the HELOC balance and past due amounts on Ms. Barnes's credit report, in or around December 2022, Ms. Barnes contacted USAA through counsel about the inaccuracies.

42.     Even though Ms. Barnes repeatedly explained to USAA that she did not authorize the increased credit limit or the additional draws on the HELOC, USAA refused to correct the issue and instead told Ms. Barnes that she was liable for the entire $350,000 balance.

43.     Unable to correct the issue directly with USAA, Ms. Barnes sent dispute letters directly to the consumer reporting agencies.

44.     First, on March 29, 2023, Ms. Barnes mailed written dispute letters to Equifax, Experian, and Trans Union.  In those letters, she explained that the account balance reported by USAA were inaccurate because she did not authorize the increased balance or draws.  She also attached the HELOC Agreement and Property Settlement, showing that she had only agreed to the $75,000 credit limit.

45. Upon information and belief, Equifax, Experian, and Trans Union forwarded Ms. Barnes's disputes to USAA.

46. USAA understood Ms. Barnes's disputes.

47. Upon information and belief, USAA did not review its correspondence and communications with Ms. Barnes to determine whether it mistakenly reported her HELOC balance. Instead, it performed only a cursory review.

48. For example, USAA did not review its own documents, including the HELOC Agreement, its correspondence with Ms. Barnes or Mr. Barnes regarding the credit limit, or its correspondence regarding Mr. Barnes's draws beyond that limit. Nor did USAA review the Property Settlement and divorce decree provided by Ms. Barnes that acknowledged Mr. Barnes's improper draws. Ultimately, USAA simply verified its previous inaccurate reporting based solely on Ms. Barnes's agreement to be jointly liable for only amounts up to the $75,000.00 credit limit.

49. USAA also included no notation that Ms. Barnes disputed the inaccurate reporting of the HELOC.

50. Consequently, Ms. Barnes's credit reports continued to show the HELOC account balance as more than $350,000.00, far more than the $75,000.00 agreed-to credit limit.

51. On or about May 11, 2023, Ms. Barnes mailed follow-up disputes to Equifax, Experian, and Trans Union. She again detailed that the USAA HELOC was not being accurately reported on her credit reports and the reasons for the inaccuracies. She also included supporting documents showing that USAA's reporting was inaccurate.

52. Upon information and belief, Equifax, Experian, and Trans Union forwarded Ms. Barnes's second disputes to USAA.

53. USAA understood Ms. Barnes's second disputes.

54. Upon information and belief, USAA did not review its correspondence and communications with Ms. Barnes to determine whether it mistakenly reported her HELOC balance. Instead, it performed only a cursory review.

55. For example, USAA did not review its own documents, including the HELOC Agreement, its correspondence with Ms. Barnes or Mr. Barnes regarding the credit limit, or its correspondence regarding Mr. Barnes's draws beyond that limit, to see if it had obtained Ms. Barnes's consent to increase the credit limit. Nor did USAA review the Property Settlement and divorce decree provided by Ms. Barnes that acknowledged Mr. Barnes's improper draws.

56. USAA also included no notation that Ms. Barnes disputed the inaccurate reporting of the HELOC.

57. Even worse, USAA updated the account to show a derogatory payment history.

58. On or about July 5, 2023, Ms. Barnes mailed a third set of disputes to Equifax, Experian, and Trans Union. She again detailed that the USAA HELOC was not being accurately reported on her credit reports and provided documentation to support her disputes.

59. Upon information and belief, Equifax, Experian, and Trans Union forwarded Ms. Barnes's third disputes to USAA.

60. USAA understood Ms. Barnes's third disputes.

61. Upon information and belief, USAA did not review its correspondence and communications with Ms. Barnes to determine whether it mistakenly reported her HELOC balance. Instead, it performed only a cursory review.

62. For example, USAA did not review its own documents, including the HELOC Agreement, its correspondence with Ms. Barnes or Mr. Barnes regarding the credit limit, or its correspondence regarding Mr. Barnes's draws beyond that limit. Nor did USAA review the

Property Settlement and divorce decree provided by Ms. Barnes that acknowledged Mr. Barnes's improper draws.

63. USAA also included no notation that Ms. Barnes disputed the inaccurate reporting of the HELOC.

64. Because of USAA's conduct, Ms. Barnes has suffered significant actual damages.

65. For example, her home of more than 30 years is at risk of foreclosure.

66. USAA's conduct has also caused Ms. Barnes's credit score to plummet, and she has suffered significant emotional distress throughout this ordeal.

### D. USAA's FCRA Violations Were Willful

67. USAA's processing of consumer disputes was willful and carried out in reckless disregard for a consumer's rights under the FCRA. In fact, USAA acted in accordance with USAA's intended procedures. In addition, USAA prioritizes processing disputes quickly over making sure that the disputes are investigated thoroughly and accurately.

68. In addition, the willfulness of USAA's FCRA violations can be established by, for example:

   a. Congress enacted the FCRA in 1970, and USAA has had over 50 years to become compliant;

   b. USAA is a corporation with access to legal advice through its own general counsel and outside litigation counsel. Yet, there is not contemporaneous evidence that USAA determined that its conduct was lawful;

   c. USAA knew, or had reason to know, that its conduct was inconsistent with the FCRA's plain language, regulatory guidance, and the relevant case law;

    d.   USAA voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless;

    e.   USAA's FCRA violations were repeated and systematic;

    f.   USAA had substantial documentation available to it that apprised it of its duties under the FCRA but still chose not to comply with the statute; and

    g.   USAA had notice of its defective dispute processing procedures through internal audits and litigation (*see, e.g.*, *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611 (6th Cir. 2012)), but chose not to meaningfully change its policies and procedures to comply with the FCRA.

**COUNT ONE**
**VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)**

69.    Ms. Barnes incorporates the preceding paragraphs.

70.    On one or more occasion within the past two years, USAA violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Ms. Barnes's disputes.

71.    When Ms. Barnes disputed the HELOC account with the credit bureaus, USAA used a dispute system named "e-Oscar," which is an automated system that the consumer-reporting agencies have developed to quickly transmit disputes to furnishers.

72.    E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systematic and uniform.

73.    E-Oscar's dispute processing is systemic and uniform: when the credit reporting agencies receive consumer disputes, they (usually via an outsourced vendor) translate each dispute into an automated consumer dispute verification ("ACDV") form.

74.    Upon information and belief, the ACDV form is way that USAA has elected to receive consumer disputes under 15 U.S.C. § 1681i(a).

75. Upon information and belief, the credit reporting agencies forwarded Ms. Barnes's disputes by ACDVs.

76. USAA understood the nature of Ms. Barnes's disputes when it received the ACDV forms.

77. Upon information and belief, when USAA received the ACDV form containing Ms. Barnes's disputes, it followed a standard and systematically unlawful process where it only reviewed its own internal computer screen for the account and repeated back the same information to the ACDV system that was previously reported to the credit reporting agency.

78. Upon information and belief, when USAA receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether there is information already in its computer system that would demonstrate the disputed information is misleading or inaccurate.

79. Because of USAA's violation of 15 U.S.C. § 1681s-2(b)(1)(A), Ms. Barnes suffered actual damages, including a reduced credit score, reputational damage, embarrassment, humiliation, stress, and other emotional distress.

80. USAA's conduct in violating 15 U.S.C. § 1681s-2(b)(1)(A) was willful, rending it liable to Ms. Barnes for punitive damages under 15 U.S.C. § 1681n. In the alternative, USAA was negligent, entitling Ms. Barnes to recovery under 15 U.S.C. § 1681o.

<u>**COUNT TWO**</u>
**VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)**

81. Ms. Barnes incorporates the preceding allegations.

82. On one or more occasion within the past two years, USAA violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the credit reporting agencies.

83. As Ms. Barnes detailed in the previous Count, USAA has elected to use the e-Oscar system for its FCRA disputes from the consumer reporting agencies.

84. When it received the ACDV forms from the credit-reporting agencies, USAA did not review any of the information that Ms. Barnes included in her dispute, which demonstrated that USAA's reporting of the HELOC account was inaccurate.

85. If USAA had reviewed this information, it would have known that its previous reporting was incorrect and needed to be updated.

86. USAA also ignored the other information that the consumer-reporting agencies provided on Ms. Barnes's disputes, including the two-digit dispute code that the agencies listed on the ACDV form.

87. USAA knew the meaning of the dispute codes used by the consumer-reporting agencies in e-Oscar.

88. USAA does not contend that the ACDV system is an inadequate means to receive FCRA disputes from the consumer-reporting agencies. USAA also received direct notice of Ms. Barnes's FCRA disputes through several correspondences sent by Ms. Barnes.

89. USAA understood Ms. Barnes's disputes and that she was disputing the unauthorized increase in the credit limit on her HELOC account and her responsibility for the amounts owed on the HELOC account.

90. Despite this, USAA did not update its incorrect reporting regarding the HELOC account and continued to inaccurately attribute the full account balance to Ms. Barnes.

91. Because of USAA's 15 U.S.C. § 1681s-2(b)(1)(B) violations, Ms. Barnes suffered actual damages, including a decreased credit score, damage to reputation, embarrassment, humiliation, and other emotional distress.

92. USAA's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for damages under 15 U.S.C. § 1681n.

93. In the alternative, USAA was negligent, entitling Ms. Barnes to recover damages under 15 U.S.C. § 1681o.

## COUNT THREE
## VIOLATION OF FCRA, 15 U.S.C. §§ 1681s-2(b)(1)(C) and (D)

94. Ms. Barnes incorporates the preceding allegations.

95. On one or more occasion within the past two years, USAA violated 15 U.S.C. §§ 1681s-2(b)(1)(C) and (D) by publishing its representations within Ms. Barnes's credit files without also including any notation at all that the account was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

96. For example, USAA failed to add the "XB" or "XC" code to the CCC (Compliance Condition Code) field of at least one of the ACDV dispute forms when it responded to the credit reporting agencies, which would have indicated that the account was disputed.

97. In addition, USAA failed to add any other notation that Ms. Barnes's account was disputed.

98. Furthermore, USAA knew that Ms. Barnes disputed the subject account through her direct and written dispute letters to the credit reporting agencies and to USAA itself.

99. Ms. Barnes's disputes were bona fide as the account reported inaccurate derogatory information.

100. Because of USAA's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), Ms. Barnes suffered concrete and particularized harm, including but not limited to: a reduced credit score, reputational damage, embarrassment, humiliation, and other emotional distress.

101. USAA's violations were willful, rendering it liable for punitive damages under 15 U.S.C. § 1681n. In the alternative, USAA was negligent, entitling Ms. Barnes to recover against it under 15 U.S.C. § 1681o.

102. Ms. Barnes is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from USAA under 15 U.S.C. §§ 1681n and 1681o.

### COUNT FOUR
**Breach of Contract or, in the Alternative, Breach of the Covenant of Good Faith and Fair Dealing**

103. Ms. Barnes incorporates the preceding allegations.

104. As described above, Ms. Barnes and her then-husband Michael T. Barnes entered into a HELOC Agreement with USAA on or about July 13, 2005. Ex. A.

105. The HELOC Agreement constitutes a valid and binding contract, with consideration made in the form a Credit Line Deed of Trust executed by the parties on or about July 2005, which secured the HELOC credit limit against the Residence.

106. The HELOC Agreement stated that the credit limit of the HELOC was $75,000.00.

107. The HELOC Agreement did not permit USAA to amend the terms of the HELOC without the written consent of Ms. Barnes or unless the amendment: (a) would "unequivocally benefit" Ms. Barnes; (b) constituted an "insignificant change"; (c) constituted a change to the index and margin that produced an annual percentage rate "substantially similar" to the rate in effect at the time the original index became unavailable; or (d) was permitted elsewhere in the Agreement.

108. Following her separation from Mr. Barnes in September 2020, without Ms. Barnes's knowledge or consent, Mr. Barnes drew on the HELOC several times in amounts that exceeded the credit limit of $75,000.00. In total, Mr. Barnes's draws increased the credit limit and account balance of the HELOC to over $350,000.00, over four times the credit limit at the time of the HELOC Agreement's execution.

15

109. USAA did not obtain Ms. Barnes's written (or even oral) consent to increase the credit limit of the HELOC above $75,000.00, as the terms of the HELOC Agreement required. Nor did USAA inform Ms. Barnes of Mr. Barnes's draws on the credit line that far exceeded the credit limit. These were material changes to the HELOC Agreement for which USAA needed to obtain Ms. Barnes's written consent.

110. USAA's failure to obtain Ms. Barnes's written consent to increase the credit limit on the HELOC above $75,000.00, or to allow draws above that amount, thus breached the terms of the HELOC Agreement.

111. Additionally, USAA breached the HELOC Agreement by failing to mail periodic statements to Ms. Barnes when there was "account activity." This failure led her to believe that there was no such account activity and prevented her from stopping additional draws on the HELOC.

112. Additionally, or in the alternative, USAA's conduct breaches the covenant of good faith and fair dealing.

113. Where a contract affords one party the ability to make discretionary decisions, the implied covenant of good faith and fair dealing limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

114. USAA violated the covenant of good faith and fair dealing by allowing Mr. Barnes to draw on the HELOC such that the balance and credit limit of the HELOC exceeded the agreed-to credit limit by more than four times, without providing notice to, or obtaining written consent from, Ms. Barnes.

115. USAA also violated the covenant of good faith and fair dealing by allowing Mr. Barnes to unilaterally change the address for periodic statements in order to conceal his fraudulent

16

activity and prevent Ms. Barnes from receiving the monthly statements to learn of the account activity.

116. Ms. Barnes has suffered harm because of USAA's breach including, but not limited to, the risk of a foreclosure of her home, a reduced credit score, and reduced credit capacity.

117. Because of USAA's breach of contract, Ms. Barnes requests that the Court award her actual damages and specific performance of the HELOC Agreement, including correction of the account balance and delinquencies reported on Ms. Barnes's credit reports.

WHEREFORE, Ms. Barnes demands judgment for actual, statutory, and punitive damages against Defendant; her attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court considers proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**CAROLYN BARNES**

By: ___/s/ Kristi C. Kelly___
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
Matthew G. Rosendahl, VSB #93738
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*